```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 10, 2013
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEXANDER OKUN, M.D.

             Plaintiff,

- against -

MONTEFIORE MEDICAL CENTER,
MONTEFIORE SEVERANCE PLAN, and
JOHN DOE, administrator of the Severance
Plan,

             Defendants.

**MEMORANDUM
OPINION & ORDER**

11 Civ. 9615 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Alexander Okun, M.D., was employed at Defendant Montefiore Medical Center ("Montefiore") for 23 years as an attending pediatrician and as an associate professor of pediatrics at the Einstein College of Medicine. On May 13, 2011, he was terminated "for cause" by Dr. Andrew Racine, his department chair at Montefiore. As a result, he was not offered severance payments pursuant to Montefiore's severance policy. Dr. Okun brings this action alleging that Defendants (1) interfered with his rights under a severance plan governed by the Employee Retirement Income Security Act ("ERISA"), in violation of ERISA § 510, 29 U.S.C. § 1140; (2) deprived him of severance benefits due under the plan, in violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); and (3) failed to make a reasonable accommodation for his disability in violation of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL").

        Defendants have moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that this Court does not have subject matter jurisdiction because Montefiore's

severance policy is not an "employee welfare benefit plan" under ERISA. (Dkt. No. 9) For the reasons set forth below, Defendants' motion will be GRANTED.

## BACKGROUND

Plaintiff was a physician at Montefiore for 23 years. (Cmplt. ¶ 14) On May 1, 2011, Plaintiff gave notice that he had accepted a position in Milwaukee, Wisconsin, and that he would be leaving Montefiore that September. (Id. ¶ 26) On May 13, 2011, Dr. Racine fired plaintiff "for cause," allegedly because he disapproved of a question Plaintiff asked during a faculty meeting with an outside speaker. (Id. ¶ 50) As a result of this "for cause" termination, Defendants refused to pay Plaintiff severance benefits under Montefiore's written severance policy, H.R. Policy No. 11-17. (Id. ¶ 68)

The stated purpose of Montefiore's severance policy is "to provide terminal benefits to full time salaried [physicians] with one or more years of employment." Schmidt Decl., Ex. A (Severance Policy) at 1) The policy applies to "[a]ll full-time [physicians] employed before August 1, 1996." (Id.) Under the policy, any physician "employed before August 1, 1996 who is terminated for other than cause may opt either for a notice period or severance pay." Id. at 2. The severance policy does not define a "for cause" termination.

The "notice period" is defined as follows:

> If a [physician] opts for a notice period, during that period, he/she shall be expected to continue to fulfill the duties and responsibilities of his/her position and shall continue to receive his/her salary and be covered by the fringe benefits to which he/she is entitled as an employee, at the level to which he/she was entitled immediately prior to the commencement of the notice period.

(Id.) If the physician opts for "severance pay" instead of the notice period, he or she "shall leave the employment of [Montefiore] and shall receive bi-weekly severance payments . . . disbursed on a bi-weekly basis on the [physician's] normal payday for the duration of the severance

period." (Id.) "The amount of each bi-weekly payment will be 1/26th of the base annual Medical Center earnings of the [physician] in effect immediately prior to the commencement of the severance/notice period, exclusive of supplemental income and fringe benefits." Id.

Physicians such as Plaintiff who have been employed at Montefiore for more than fifteen years are entitled to their "[c]hoice of twelve month's notice or six month's severance pay," provided that they are not terminated "for cause." (Id.) Physicians with more than fifteen years of service are also "entitled to automatic review of the amount of severance pay by the President of [Montefiore]." (Id.)

The policy provides that once terminated, eligible physicians will receive a "written notice of termination with a description of their options, i.e., notice period or salary continuation." (Id. at 3) The policy requires terminated physicians to choose between severance pay and notice period benefits within seven days of receiving their "written notice of termination." (Id.) If a physician does not make a choice within the seven-day period, he or she "will be deemed to have elected the notice period." (Id.) If the physician elects severance pay, "it cannot be changed to notice once the salary continuation is started." (Id.) Even if a physician opts for the notice period, Montefiore retains the right to "require that [physician to] leave [Montefiore] immediately or at any time during the notice period." (Id.) "In such a case, unless the [physician] is terminated for cause, during the balance of the notice period, the [physician] shall receive bi-weekly severance payments. . . ." (Id.)

The policy further provides that it "may be changed, modified or discontinued at any time by [Montefiore's] Senior Vice President of Human Resources, or designee, with or without notice. Exceptions do not invalidate the basic policy." (Id.) The severance policy does

3

not provide for plan fiduciaries, employee contributions, formal procedures for submitting claims, a specific trustee or plan administrator, or monies set aside or held in trust.

Because Plaintiff was terminated "for cause," he was not offered either severance pay or a notice period under the severance policy. (Cmplt.¶ 84)

The Complaint was filed on December 28, 2011. (Dkt. No. 1) Defendants filed their motion to dismiss on September 24, 2012. (Dkt. No. 9)

## DISCUSSION

### I. LEGAL STANDARD

"Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 130 S. Ct. 2869 (2010). "On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), '[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.'" Sharehold Representative Servs. LLC v. Sandoz Inc., No. 12 Civ. 6154 (DLC), 2013 WL 4015901, at *6 (S.D.N.Y. Aug. 7, 2013) (quoting Aurecchione v. Schoolman Transp. System, Inc., 426 F.3d 635, 638 (2d Cir. 2005)). "In reviewing such a motion, the court 'must accept as true all material factual allegations in the complaint, but [is] not to draw inferences from the complaint favorable to plaintiff[].'" Id. (quoting J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir. 2004)). "In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may . . . refer to evidence outside the pleadings." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) (citing Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)).

## II. ANALYSIS

Plaintiff argues that Montefiore's severance policy is governed by ERISA, and that accordingly this Court has federal question jurisdiction. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Defendants contend that the Court lacks subject matter jurisdiction because the severance policy is not governed by ERISA.

### A. Applicable Law

Federal courts have original jurisdiction to hear claims for severance benefits where the severance policy at issue constitutes an "employee welfare benefit plan" under ERISA. Tischmann v. ITT/Sheraton Corp., 145 F.3d 561, 566-67 (2d Cir. 1998). Section 3 of ERISA defines an "employee welfare benefit plan" as:

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries . . . (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services.

29 U.S.C. § 1002(1).

It is well established that "a program to pay severance benefits may constitute an 'employee welfare [benefit] plan.'" James v. Fleet/Norstar Fin. Grp., Inc., 992 F.2d 463, 468 (2d Cir. 1993). The Second Circuit has stated that

> [t]he term "employee welfare benefit plan" has been held to apply to most, but not all, employer undertakings or obligations to pay severance benefits. Yet, both the Supreme Court and [the Second Circuit] have emphasized that ERISA applies only where such an undertaking or obligation requires the creation of an ongoing administrative program.

5

Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 75 (2d Cir. 1996) (citing Fort Halifax Packaging Co. v. Coyne, 482 U.S. 1, 12 (1987)).

"Although it is clear . . . that an ongoing administrative program is necessary for severance benefits to constitute a plan for ERISA purposes, it is less clear what constitutes an 'administrative program.'" Dennis v. RSL COM U.S.A., Inc., No. 97 Civ. 5013 (HB), 1998 WL 409720, at *3 (S.D.N.Y. July 21, 1998). In determining whether a severance policy rises to the level of an ERISA plan, courts consider several factors:

> (1) "whether the employer's undertaking or obligation requires managerial discretion in its administration"; (2) "whether a reasonable employee would perceive an ongoing commitment by the employer to provide employee benefits"; and (3) "whether the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria."

Tischmann, 145 F.3d at 566 (quoting Schonholz, 87 F.3d at 76). The Second Circuit has noted that "other factors might be relevant in a different factual setting." Tischmann, 145 F.3d at 566.

In Fort Halifax, James, Schonholz, and Tischmann, the Supreme Court and the Second Circuit applied these factors in determining the scope of ERISA coverage in the context of several different types of severance disputes. In Fort Halifax, the Supreme Court considered whether a Maine statute – that required employers who relocated or otherwise closed a plant to provide a one-time severance payment to employees who had worked at the plant for at least three years – established or required employers to maintain an employee benefit plan within the meaning of ERISA. 482 U.S. at 3-5 & n.1, 12. The Court reasoned that the Maine statute's imposition of a one-time, contingent obligation on employers did not require the creation of any "employee welfare benefit plans":

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and

6

>thus faces no periodic demands on its assets that create a need for financial coordination and control. . . . To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

Id. at 12.

In James, the Second Circuit held that an employer had not created an employee benefit plan where, in light of a planned consolidation and workforce reduction, it had agreed to pay employees who would work until the end of the consolidation period an amount of money equal to 60 days' additional pay. 992 F.2d at 464-67. The employer agreed to make the payment after each eligible employee's last day of work, and the employees could elect to be paid either in a lump-sum or in bi-weekly installments. Id. at 464. The Second Circuit concluded that the employer's undertaking did not require an ongoing administrative program and therefore it was not an ERISA plan. Id. at 467. In reaching this result, the court noted that the severance payments would "occur over a short time," and that the "need to make . . . simple arithmetical calculations" to determine the amount of payment to each employee "did not require the 'establish[ment of] a uniform administrative scheme.'" Id. (quoting Fort Halifax, 482 U.S. at 9).

By contrast, in Schonholz, the Second Circuit determined that an employer had created an employee benefit plan when it agreed to pay severance benefits to certain terminated senior employees. 87 F.3d at 74, 76-77. The severance payments were made in amounts "based upon both the length of time the employee held his position and his prospects for reemployment, but they would be made only if the employee displayed a reasonable and good faith effort to obtain a position commensurate with his former level of responsibility." Id. at 74. An employee

7

would also not be entitled to benefits if he was terminated for "illegal conduct or substantially deficient performance." Id. In determining that the severance policy was an employee benefit plan, the Schonholz court found significant that the plan contained no provision for its termination or amendment and that it was "not limited either to a single payment or to a short span of time upon a plant or office closing." Id. at 74-76. Thus, it was clear that "a reasonable employee would have believed that the Severance Plan evidenced an ongoing commitment to provide severance benefits." Id. at 76.

In Tischmann, the Second Circuit considered a severance plan that provided benefits to certain involuntarily terminated employees on the condition that the terminated employees "continue to be available to render the [employer] reasonable assistance, consistent with the level of the [employee's] prior position with the [employer], at times and locations that are mutually acceptable." 145 F.3d at 566-67. The severance plan provided that terminated employees would lose entitlement to benefits "for failure to comply with specified standards of conduct during the period of receipt of benefits." Id. at 567. The plan further provided that severance payments would be made in an amount based on the employee's salary and would be paid out – at the employer's election – either in accordance with the employer's regular payroll schedule or in a lump sum. Id. at 562. In the event that an executive was terminated "for cause," he or she had no right to payments under the severance plan. Id. Finally, the plan provided that the employer retained the right to terminate or amend the plan, subject to the condition that any such termination or amendment could not "'reduce or adversely affect' the severance benefits of any eligible employee 'whose employment terminates within two years of the effective date' of plan termination (or amendment)." Id. at 566.

8

In concluding that the severance plan was governed by ERISA, the Second Circuit acknowledged that the employer's right to terminate or amend the plan weighed against a finding of ERISA coverage, but noted that "the termination right is not absolute." Id. The court further noted that "other factors weigh in favor of viewing the [severance plan] as an 'ongoing,' though not limitless, commitment to pay benefits." Id. In this regard, the court cited the fact that the severance plan was "'not limited either to a single payment or to a short span of time upon a plant or office closing,'" but instead was "designed to pay benefits when each covered executive leaves [the employer]; these departures might well be expected to occur over a protracted period of time." Id. (quoting Schonholz, 87 F.3d at 76). The court also noted that the severance plan provided for "an ongoing relationship between [the employer], as plan administrator, and covered employees" in that covered executives were required to provide the employer with "reasonable assistance . . . at times and locations that are mutually acceptable" Id. A failure to comply with this provision would result in a loss of benefits under the severance plan. Id.

The court further concluded that consideration of the other Schonholz factors – managerial discretion and case-by-case analysis of each termination – favored application of ERISA. In this regard, the court noted that the employer was "required under the plan to examine the circumstances of each covered employee's termination and to determine whether it was 'for cause'; if so the employer is rendered ineligible for benefits." Id. at 567. With respect to the case-by-case analysis factor, the court noted that the plan provided that the employer could terminate benefits for a host of reasons, including where the employee

> (i) engages in any activity which is inimical to the best interests of the Company; (ii) disparages the Company; (iii) fails to comply with any Company Covenant Against Disclosure and Assignment of Rights to Intellectual Property; (iv) without ITT's prior consent, induces any employees of the Company to leave their Company employment; (v) without ITT's prior consent, engages in, becomes affiliated with, or becomes

9

employed by any business competitive with the Company; or (vi) fails to comply with applicable provisions of the ITT Code of Conduct or applicable ITT Subsidiary Code or policies. . . .

Id. Eligibility for severance benefits under the plan also required the employer "to determine what constitutes 'reasonable assistance, consistent with the level of the Executive's prior position'" and would also have to 'take into account any other commitments which the Executive may have.'" Id. The court concluded that "the plan's benefits structure incorporates numerous context-sensitive judgments, requiring managerial discretion on a continuing, individualized basis." Id.

With all of these cases in mind, the Court will now turn to an analysis of the severance policy at issue here, starting with the first Schonholz factor: whether the severance policy "requires managerial discretion in its administration." Schonholz, 87 F.3d at 76.

### A.     Whether the Severance Policy Requires Managerial Discretion

Defendants contend that Montefiore exercises no discretion in determining the amount, form, or timing of any severance payments, and argue that any severance payments are automatically calculated on the basis of the employee's base annual earnings in effect immediately prior to the severance period. (Def. Br. 8) Plaintiff argues that Montefiore exercises managerial discretion in determining whether an employee is eligible for severance benefits, the amount of severance payments once eligibility is established, and the timing of the payments. (Pltf. Opp. Br. 7-12)

#### 1.     Initial Eligibility

Plaintiff argues that Montefiore exercises managerial discretion in determining initial eligibility for severance benefits because it determines whether to terminate employees "for cause." (Pltf. Opp. Br. 7-10) Defendants argue that Montefiore's eligibility determination

10

is made "in the exercise of its ordinary business discretion, not discretion in the administration of its severance policy." (Def. Reply 3-4) Defendants' argument is unavailing.

The Second Circuit and district courts in this circuit have held that the determination of whether an employee is terminated "for cause" requires the exercise of "significant managerial discretion" for purposes of determining ERISA coverage of a severance plan. Tischmann, 145 F.3d at 567; see also Kosakow v. New Rochelle Radiology Associates, P.C., 274 F.3d 706, 737 (2d Cir. 2001) (noting that "an individual [managerial] determination must be made as to whether an employee was terminated for sufficient cause such that she forfeited her severance benefits"); Lamantia, 2007 WL 2816188, at *5 ("A determination of which employees are terminated 'for cause' requires managerial discretion."); Gabelman v. Sher, No. 11 Civ. 2718 (DLI), 2012 WL 1004872, at *3 (E.D.N.Y. Mar. 23, 2012) ("A plan may require managerial discretion where, for example, benefits are conditioned on the employer's determination as to whether an employee's termination was 'for cause.'"); accord Simas v. Quaker Fabric Corp., 6 F.3d 849, 853 (1st Cir. 1993) (concluding that determining whether an employee has been discharged "for cause" required managerial discretion because "[t]he 'for cause' determination . . . is likely to provoke controversy and call for judgments based on information well beyond the employee's date of hiring and termination").

Against this authority, Defendants cite Sheer v. Israel Disc. Bank of New York, No. 06 Civ. 4995 (PAC), 2007 WL 700822 (S.D.N.Y. Mar. 7, 2007); Taverna v. Credit Suisse First Boston (USA), Inc., 02 Civ. 5240 (DC), 2003 WL 255250 (S.D.N.Y. Feb. 4, 2003), Lavoie v. SBC Commc'ns, Inc., 04 Civ. 1116 (CFD), 2007 WL 708785 (D. Conn. Feb. 20, 2007); Gautier-Figueroa v. Bristol-Myers Squibb P.R., 845 F. Supp. 2d 444, 460 (D.P.R. 2012); and Delaye v. Agripac, Inc., 39 F.3d 235 (9th Cir. 1994)). (Def. Reply 3-4 & n. 2) In all of these

11

cases, however, the employer either had specific written criteria governing whether an employee's termination should be considered "for cause," or the employer did not have to make a "for cause" determination. Where an employer has specific written criteria for determining whether an employee is terminated "for cause," the scope "of discretion is not open-ended, but rather requires the employer to analyze only a fixed set of criteria"; this "is not the type of managerial discretion contemplated by ERISA." Sheer, 2007 WL 700822, at *3. Here, Montefiore's severance policy does not set forth criteria to determine whether an employee's termination should be considered "for cause."

Accordingly, Montefiore's decision to terminate an employee "for cause" – and thereby render the employee ineligible for severance benefits – requires the exercise of significant managerial discretion.

### 2. Severance Amount

Defendants argue that Montefiore exercises no managerial discretion in determining the amount of severance because severance payments under the severance policy are fixed as a percentage of earnings. (Def. Br. 8; Def. Reply 6) Plaintiff argues that the severance policy's provision allowing employees with 15 or more years of service to seek review of the amount of severance by Montefiore's President constitutes managerial discretion as to the severance amount. (Pltf. Opp. Br. 10-12)

To the extent that a physician's severance payments are calculated pursuant to the formula set forth in the severance policy, no exercise of managerial discretion is involved. (Schmidt Decl., Ex. A (Severance Policy) at 2) This "simple arithmetical calculation[]" does not require managerial discretion. James, 992 F.2d at 468; Taverna, 2003 WL 255250, at *3.

12

A physician such as Plaintiff with more than fifteen years of service at Montefiore is, however, entitled to "automatic review of the amount of severance pay by the President of the Medical Center." (Schmidt Decl., Ex. A (Severance Policy) at 2) This provision appears to give the President complete discretion to determine the appropriate amount of severance pay; the policy sets forth no criteria that the President is to consider in making his or her determination. While the policy thus gives the President unbridled discretion to determine the amount of severance pay a doctor with fifteen or more years of service should receive, there is nothing about that discretion that suggests a need for an ongoing administrative program. See Taverna, 2003 WL 255250, at *4 ("[T]he Transition Agreement does provide for some exercise of managerial discretion because it provides for the payment of a 'discretionary additional amount, if any.' But this 'additional amount' was to be paid, if at all, not on the basis of specified criteria but on the exercise of CSFB's sole discretion. There still was no need for an ongoing administrative program."). In sum, the discretion accorded to the President under the severance policy is not the type of managerial discretion that suggests the need for an ongoing administrative program.

### 3.    The Timing of the Severance Payments

Plaintiff next argues that Montefiore exercises discretion in the timing of severance payments, because where an employee elects the notice period option, Montefiore retains the right to terminate the notice period and immediately trigger severance payments. (Pltf. Opp. Br. at 12) However, an employer's unilateral ability to "shorten . . . [an employee's] period of active employment . . . relates to the ordinary operation of [the employer's] business, not administration of the [severance a]greement." Gabelman, 2012 WL 1004872, at *4.

Accordingly, Montefiore's right to terminate a physician's employment during the notice period does not support Plaintiff's argument that Montefiore's severance policy is an ERISA plan.

* * * *

In sum, with respect to the managerial discretion factor, the only aspect of Montefiore's severance plan that suggests a need for an ongoing administrative program is the provision barring employees terminated "for cause" from receiving severance benefits.

### B.   Reasonable Employee's Perception of an Ongoing Commitment

The second factor in determining whether a severance policy is governed by ERISA is whether a reasonable employee would perceive an ongoing commitment by the employer to provide benefits. In connection with this factor, courts consider: (1) whether the severance policy "is subject to termination or amendment" by the employer, Tischmann, 145 F.3d at 566; (2) the employer's "ongoing responsibilities" in administering the severance policy, Nowak v. Int'l Fund Servs. (N.A.), LLC, No. 09 Civ. 5130, 2009 WL 2432715, at *2 (S.D.N.Y. Aug. 7, 2009); and (3) whether the terms of the severance policy are clear and definite and have a definite termination date. Id. at *2-3; see also Taverna, 2003 WL 255250, at *3 (finding no "ongoing commitment" where severance policy provided for a fixed amount of one month's salary for each year worked plus medical benefits).

With respect to the first consideration, where a severance policy is "subject to termination or amendment by [the employer,] . . . [that] weighs against the conclusion . . . that a reasonable employee would perceive the plan as an 'ongoing commitment.'" Tischmann, 145 F.3d at 566. By contrast, where a plan's "effective period [i]s unlimited," that would "reasonably be[] perceived by an employee as an ongoing commitment." Schonholz, 87 F.3d at 76-77.

14

Here, Montefiore's severance policy provides that it "may be changed, modified or discontinued at any time by [Montefiore's] Senior Vice President of Human Resources, or designee, with or without notice. Exceptions do not invalidate the basic policy." (Schmidt Decl., Ex. A (Severance Policy) at 3) Plaintiff argues that the sentence "[e]xceptions do not invalidate the basic policy" means that "while the policy may be subject to change or exception, the basic policy will remain in effect," and thus a reasonable employee could perceive an ongoing commitment. (Pltf. Opp. Br. at 13-14) This Court finds that Montefiore's severance policy clearly states that Montefiore has retained the right to change, modify or discontinue the severance policy "at any time . . . with or without notice." (Schmidt Decl., Ex. A (Severance Policy) at 3) Under Tischmann, 145 F.3d at 566, this language weighs against finding an ongoing commitment.

As to the second consideration, Montefiore undertook few if any "ongoing responsibilities" in administering the policy. Montefiore's only obligation was to make the periodic severance payments. See Nowak, 2009 WL 2432715, at *3 (where employer "had no ongoing responsibilities under the agreements other than sending checks and Plaintiffs had no obligations to [the employer]," this consideration weighed against finding that the plan at issue was governed by ERISA); Sheer, 2007 WL 700822, *2 (holding that a reasonable employee would not conclude that the employer was making an "ongoing commitment" to employees where the severance plan merely required that the employee leave the company).

Finally, the third consideration also weighs against finding an ongoing commitment, because Montefiore's severance policy clearly explains Montefiore's severance obligations, how the money will be paid out, and over what period of time the money will be paid out. See Nowak, 2009 WL 2432715, at *3 (finding no ongoing commitment where

15

severance policy provided "a specific and defined commitment between the company and [certain employees]").

The "ongoing commitment" factor weighs against a finding that Montefiore's severance policy is an ERISA plan.

C. **Individual Analysis of Termination**

The third factor is whether Montefiore is required to separately analyze the circumstances of each employee's termination in light of certain criteria. Schonholz, 87 F.3d at 76. Plaintiff argues that Montefiore was required to perform this analysis in order to determine whether or not an employee's termination was "for cause." (Pltf. Opp. Br. at 16-18) The third factor implicates more than the need for a "for cause" determination, however. In analyzing the third factor, courts consider whether employees are "required to look for other jobs, be available to [the employer] to work as needed []or do anything else that would require an individualized determination to receive benefits going forward." Lamantia, 2007 WL 2816188, at *6; see also Tischmann, 145 F.3d at 567 (noting that employer was required to determine whether, inter alia, the employee had "(i) engage[d] in any activity which is inimical to the best interests of the Company; (ii) disparage[d] the Company; (iii) fail[ed] to comply with any Company Covenant Against Disclosure and Assignment of Rights to Intellectual Property; (iv) without ITT's prior consent, induce[d] any employees of the Company to leave their Company employment; (v) without ITT's prior consent, engage[d] in, become[] affiliated with, or become[] employed by any business competitive with the Company; or (vi) fail[ed] to comply with applicable provisions of the ITT Code of Conduct or applicable ITT Subsidiary Code or policies. . . ."); Schonholz, 87 F.3d at 76 (finding third factor satisfied where employer was required to determine, inter alia, "whether the employee was making a reasonable and good faith effort to

obtain suitable employment elsewhere; and whether, if other employment had been found, it was commensurate with the employee's former organizational level and scope of responsibility").

obtain suitable employment elsewhere; and whether, if other employment had been found, it was commensurate with the employee's former organizational level and scope of responsibility").

The considerations set forth in Tischmann, Schonholz, and Lamantia are not present here. Payments under Montefiore's severance policy are not conditioned on the satisfaction of any criteria. Once an employee qualifies for severance, severance payments are made based on an arithmetical calculation of how much the employee is owed. Accordingly, this factor also weighs against finding that Montefiore's severance policy is a plan governed by ERISA. See James, 992 F.2d at 468 ("The simple arithmetical calculations and clerical determination that [the employer] was required to make to ascertain each [employee's] severance pay was a far cry from the 'ongoing, particularized, administrative, discretionary analysis' required of the employer [under an ERISA plan].").

Finally, it is worth noting that many of the typical features of an ERISA plan are absent here: there are no plan fiduciaries, no employee contributions, no formal procedures for submitting claims, and no monies set aside or held in trust. See Taverna, 2003 WL 255250, at *4.

\* \* \* \*

Most of the factors that this Court must consider in determining whether Montefiore's severance policy is governed by ERISA weigh against such a determination. This Court concludes that Plaintiff has not met his burden of demonstrating that Montefiore's severance plan is governed by ERISA. Accordingly, there is no federal cause of action and this case must be dismissed for lack of subject matter jurisdiction. See Lamantia, 2007 WL 2816188,

at *6 (court lacks subject matter jurisdiction where severance plan is "not governed by ERISA").[1]

## CONCLUSION

Defendants' motion to dismiss is GRANTED. The Clerk of the Court is directed to terminate the motion (Dkt. No. 9) and to close this case.

Dated: New York, New York
September 10, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge

---

[1] Because this Court lacks subject matter jurisdiction, "the court must dismiss the complaint in its entirety" and may not exercise supplemental jurisdiction over Plaintiff's state law claims. Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006).